UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MICHAEL A. FRYE,

               Petitioner,

v.                                         Case No:  5:19-cv-311-BJD-PRL

SECRETARY, DEPARTMENT OF
CORRECTIONS and FLORIDA
ATTORNEY GENERAL,

               Respondents.

_____

## ORDER

### I. Status

Petitioner, Michael Frye, is proceeding on a Second Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (Doc. 14; Sec. Am. Pet.). Petitioner challenges a state court (Marion County) judgment of conviction for which he is serving multiple life sentences. Sec. Am. Pet. at 1. Petitioner raises twenty-eight grounds for relief: nine alleging ineffective assistance of appellate counsel; fifteen alleging ineffective assistance of trial counsel; and four alleging error during his postconviction proceedings. See generally id. Respondents filed a Response (Doc. 26; Resp.)

with an appendix (Docs. 27-1 through 27-3).[1] Respondents concede the Petition was timely filed. Resp. at 8. Petitioner has not filed a reply, though the Court afforded him an opportunity to do so. <u>See</u> Order (Doc. 19).

Respondents interpret Petitioner to raise twenty-nine grounds in his Petition. Resp. at 16-17. However, the ground Respondents identify as the twenty-ninth and construe as an additional ineffective-assistance-of-trial-counsel claim appears to be Petitioner's argument that <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012), saves his ineffective-assistance-of-trial-counsel claims from procedural default. <u>See</u> Sec. Am. Pet. at 83-87.

## II. Evidentiary Hearing

Petitioner requests an evidentiary hearing because, according to him, he "was not afforded a full and fair Evidentiary Hearing in the State Court." <u>Id.</u> at 93. "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>,

---

[1] The Court will cite the appendix by document number (27-1, 27-2, or 27-3) followed by the page number as assigned by the Court's electronic case management system.

550 U.S. 465, 474 (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.

Petitioner has not carried his burden. The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## III. Governing Standards of Review

### A. Habeas Standard

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs a state prisoner's federal petition for habeas corpus. See 28 U.S.C. § 2254. That section provides, "[A] district court shall entertain an application for a writ of habeas corpus in [sic] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under AEDPA, federal habeas relief "shall not be granted" unless a petitioner shows the state court's adjudication of the claim—

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016) (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review under § 2254 is "'greatly circumscribed' and 'highly deferential.'" Id. (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)). The "highly deferential" standard is meant to be difficult to surmount. Harrington v. Richter, 562 U.S. 86, 102 (2011). See also White v. Woodall, 134 S. Ct. 1697, 1702 (2014). A habeas petitioner must demonstrate "the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1349 (11th Cir. 2019) (alteration in original).

A federal district court must give appropriate deference to a state court decision on the merits. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). As such, the first task of a federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. Marshall v. Sec'y

Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for its decision to qualify as an adjudication on the merits. Richter, 562 U.S. at 100. Where the state court's adjudication on the merits is unaccompanied by an explanation, the district court should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale . . . . [and] presume that the unexplained decision adopted the same reasoning." Wilson, 138 S. Ct. at 1192.

Under federal habeas review, the burden of proof is high; "clear error will not suffice." Virginia v. LeBlanc, 137 S. Ct. 1726, 1728 (2017) (quoting Woods v. Donald, 575 U.S. 312, 316 (2015)). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." § 2254(e)(1). As such, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013).

**B. Exhaustion and Procedural Default**

When a state court did not have an opportunity to address the merits of a petitioner's claims, the habeas petition "shall not be granted." 28 U.S.C. § 2254(b)(1)(A). That is because before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. Id. See also Shinn v. Ramirez, 142 S. Ct. 1718,

1727 (2022) ("A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures.").

To exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989). A petitioner must "alert[] [the] court to the federal nature of the claim" to "fairly present" it. Baldwin v. Reese, 541 U.S. 27, 29 (2004). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). See also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process."). "The exhaustion requirement springs from principles of comity, which protect the state court's role in the enforcement of federal law and prevent disruption of state court proceedings." Ward v. Hall, 592 F.3d 1144, 1156 (11th Cir. 2010).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

6

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed.

Martinez, 566 U.S. at 9-10 (internal citations omitted). If a claim has been procedurally defaulted, a federal court may consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default or (2) a fundamental miscarriage of justice. Ward, 592 F.3d at 1157. For a petitioner to establish cause and prejudice,

> the procedural default 'must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct.' Under the prejudice prong, [a petitioner] must show that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999) (internal citations omitted).

Without a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice—the continued incarceration of one who is actually innocent—otherwise would result. Ward,

592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show (1) counsel's performance was outside the wide range of reasonable, professional assistance and (2) counsel's deficient performance prejudiced his defense. Strickland, 466 U.S. at 687. The prejudice prong requires a showing that there is a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different. Id. at 695.

When a petitioner claims his counsel was ineffective, "[r]eviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). Indeed, the petitioner must "prove, by a preponderance of the evidence, that counsel's performance was unreasonable[.]" Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006). A court must "judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct," applying a "highly deferential" level of judicial scrutiny. Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).

When the "strong presumption" standard of Strickland is applied "in tandem" with the highly deferential AEDPA standard, a review of the state court's determination as to the "performance" prong is afforded double deference. Richter, 562 U.S. at 105. Accordingly, the question for a federal court is not whether trial counsel's performance was reasonable, but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," a federal court may not disturb a state-court decision denying the claim. Id. As such, "[s]urmounting

Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

This two-part Strickland standard also governs claims of ineffective assistance of appellate counsel. Overstreet v. Warden, 811 F.3d 1283, 1287 (11th Cir. 2016). As with trial counsel, a court will presume appellate counsel's performance was reasonable. Id. Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. Id. (citing Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009)). See also Owen v. Sec'y, Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009) ("[F]ailing to raise or adequately pursue [meritless issues on appeal] cannot constitute ineffective assistance of counsel.").

To satisfy the prejudice prong of an ineffective assistance of appellate counsel claim, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004). See also Philmore, 575 F.3d at 1264-65 (explaining that a petitioner may establish prejudice only if a claim not raised by appellate counsel "would have a reasonable probability of success on appeal"). As such, "[a]ppellate counsel might fail to identify a mediocre or obscure basis for reversal without being ineffective under Strickland." Overstreet, 811 F.3d at 1287 (citation omitted).

Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Ward</u>, 592 F.3d at 1163 ("[There is no] iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other."). Thus, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

## IV. Facts & Procedural History

In a four-count amended information filed on the day trial began, Petitioner was charged with armed kidnapping and three counts of sexual battery for an incident that occurred on October 12, 2011. Doc. 27-2 at 55-56.[2] A few days before the trial started, the court held a <u>Williams</u>[3] Rule hearing on the State's notice of intent to introduce prior wrongs, acts, or crimes ("collateral crimes evidence"). Doc. 27-1 at 380. Two other sexual battery cases were pending against Petitioner at the time, and the State sought to introduce testimony from the two other alleged victims (J.M. and T.R.) to prove Petitioner had "motive" and "opportunity" to commit the crime given all three

---

[2] The late amendment of the information is the subject of some of Petitioner's grounds for relief. The Court will address the substantive changes to the amended information later in this Order.

[3] <u>Williams v. State</u>, 110 So. 2d 654 (Fla. 1959).

incidents were "substantially similar." Id. at 391, 397, 381. The prosecutor noted that, in all three cases, Petitioner invited or forced the female victims into his vehicle and took them to a different location where he demanded oral sex and battered them.[4] Id. at 394-95, 402-03, 406. The prosecutor said the State was not seeking to admit the collateral crimes evidence to prove the issue of "identity" because the State had DNA evidence linking Petitioner to the victim in the case before the Court for hearing. Id. at 393, 396-97.

The judge took the motion under advisement, so he could read relevant deposition transcripts and conduct research. Id. at 487-88.[5] Ultimately, the court ruled the collateral crimes evidence was not relevant to the State's case-in-chief because there was no issue of "identity" or "state of mind." Id. at 489-90. However, the court perceived from the record that Petitioner, during his case-in-chief, potentially could argue the victim consented to the sexual encounter either because she was a prostitute or for drugs. Id. at 491. Thus, the court ruled, "if [Petitioner] chooses to testify and he raises issues of consent

_____

[4] Local news outlets in Ocala had dubbed Petitioner the "Ocala Serial Rapist." The trial judge granted Petitioner's motion in limine to prevent anyone from referring to him as such. Doc. 27-1 at 389. See also Doc. 27-2 at 138.

[5] The judge noted on the record that the "parties through counsel . . . agreed . . . there would be no live testimony" from the alleged victims at the Williams Rule hearing. Doc. 27-1 at 488. In lieu of hearing live testimony from the alleged victims, the judge read their depositions—including that of the victim in this case. Id.

12

or something that causes the other matters to be relevant, the State can present [the collateral crimes] evidence in rebuttal." <u>Id.</u> at 492-93.

Because of the court's ruling on the collateral crimes evidence, Petitioner chose not testify at trial. <u>Id.</u> at 911. Petitioner told the court, "I feel that because of the Williams Rule [sic] . . . . I choose not to testify." <u>Id.</u> at 911-12. Petitioner's counsel informed the court, "[W]hat [Petitioner] indicated to me – I believe that [his testimony] would allow the ... State to introduce the . . . [evidence]." <u>Id.</u> at 912. The prosecutor clarified that the State had "no intention of calling the ... [two other victim-witnesses] unless . . . the issue is brought up that . . . makes the [evidence relevant for rebuttal]." <u>Id.</u> The court emphasized to Petitioner and his counsel the basis for and parameters of the ruling:

> [I]f [Petitioner] takes a position differently than it's a consent, then it doesn't come in. If he takes a position that, yes, this was consensual sex based upon what I think are sufficient similarities under the Williams [sic] Rule which I believe is more relaxed [when] it's not the issue of identity I would most likely then admit that. I preliminarily did it and I made my ruling saying [the State] can't put it in [its] case in chief. We'll see where it goes because it was unnecessary. But it may become necessary, it may not be.

<u>Id.</u> at 913. Petitioner's counsel responded, "I explained to [Petitioner] that it's not a hundred percent guaranteed but that there is a chance of [the collateral crimes evidence] coming in, [sic] if he testifies. There is no chance of it coming in, [sic] if he does not testify." <u>Id.</u> at 914. The judge then questioned Petitioner

to ensure his decision not to testify was made "freely and voluntarily." Id. at 914-15. The judge found it was. Id. at 915. The defense put on no witnesses. Id.

The evidence adduced by the State during its case-in-chief showed Petitioner saw the victim walking down the street, forced her into the green Dodge van he was driving (owned by his then father-in-law), drove her to a secluded, wooded area down a dirt road and, once there, forced her into the back seat where he physically and sexually battered her. Id. at 582, 587, 589-90, 593-94, 595-97, 857. The victim testified that during the drive, Petitioner called her names, hit her in the face, chest, and other places, and threatened to kill her. Id. at 590. Once parked, Petitioner brandished a box cutter and forced the victim to remove her pants and underwear, grabbed her vagina, put his fingers and tools covered in plastic inside her vagina, put his fingers inside her anus, and ordered her to perform oral sex, which she did. Id. at 597-600.

The victim managed to escape by picking up the box cutter, which Petitioner had set down, and "swinging at [Petitioner]," cutting him. Id. at 601-02. The victim, naked, exited the van through the front passenger door and ran. Id. at 602. She made it to a cul-de-sac and managed to flag down a car with two people inside. Id. at 603. They stopped, covered the victim with some clothing, put her in the back seat, and drove her to a gas station where someone called the police. Id. at 603-04.

14

The witness who transported the victim from the scene to the gas station testified at trial. Id. at 549. She recalled seeing a naked woman running down the road waving her arms in the air and asking for help. Id. at 551-52. The witness noticed the victim had blood on her arm, which the victim told the witness was not her own. Id. at 552-53. The victim appeared "very exhausted, distraught, [and] tired" and told the witness she had been raped. Id. at 553-54. The victim also "kept saying she hurt . . . [d]own in her vagina area." Id. at 555. The victim passed out twice in the witness's car. Id.

When emergency personnel arrived, the victim's arm was wrapped with gauze "to preserve any evidence." Id. at 561, 569. The victim described her attacker to first responders as a "white male, [with] dark hair, [wearing] glasses, [a] T-shirt, . . . [b]lack pants . . . [and with] a tattoo on . . . [his] neck and a very colorful tattoo on [his] arm with lacerations through the tattoo." Id. at 562, 573. She also described the vehicle as a minivan. Id. at 562-63. The morning after the incident, the victim, at the request of investigating officers, drew a sketch of one of the tattoos. Id. at 605, 706.

The nurse who performed a forensic sexual assault examination on the victim at the hospital testified at trial. Id. at 771-72. She described the victim as "in a heightened state of anxiety" and "sobbing uncontrollably." Id. at 774. Some photos of the victim's injuries were published to the jury. Id. at 776. In addition to injuries to her face, neck, upper torso, feet, and inner thighs, the

victim had marked swelling in the vaginal area and redness and tenderness around the anus. Id. at 778-83, 789-92, 800. The nurse noted that the victim was unable "to tolerate a speculum exam."[6] Id. at 790. The nurse testified that the victim's injuries were "consistent with the way that [the victim] described them to have occurred." Id. at 793. According to the nurse, the victim's injuries, which were examined at about 10:10 p.m., would have happened within the prior three to six hours.[7] Id. at 773, 793. On cross-examination, the nurse confirmed the victim's injuries "could have been done in a manner other than the way [the victim] said [they] happened." Id. at 799, 801-02.

Investigators obtained surveillance footage from two businesses in connection with their investigation. First, an employee of Cone Distributing testified that an officer with the Ocala Police Department (OPD) contacted him asking for video footage of the area of the building facing 44th Avenue. Id. at 654. An OPD detective testified at the trial that Cone Distributing was located at the end of the dirt road where Petitioner parked the green van on the day of the incident. Id. at 672. The detective explained that the dirt road ends near a dry retention pond at 44th Avenue, which is a paved road. Id. Forty-fourth Avenue itself "dead ends" near Cone Distributing where "there are numerous

---

[6] A speculum is a tool used to look at the cervix. Doc. 27-1 at 792.

[7] A first responder testified the emergency call came in at about 6:30 p.m. Doc. 27-1 at 566.

barricades set up." Id. Officers noticed tire tracks near the dry retention pond and 44th Avenue. Id. at 673. They also observed one of the barricades had been knocked down. Id.

When the detective reviewed the surveillance footage from Cone Distributing, he observed "a vehicle traveling northbound on 44th Avenue coming out of the area of [the] dry retention pond . . . . and then the vehicle attempt[ed] to drive around the barricades or through the barricades and actually knock[ed] over [a] barricade." Id. at 675. At trial, the prosecutor showed the jury screen shots from the four camera angles the detective obtained from the Cone Distributing employee. Id. at 676-79. The detective explained that the video footage was dated October 12, 2011, at the "time frames of interest." Id. at 677.

The second video surveillance came from a tattoo shop called Extreme Ink Tattoo. Id. at 830. An Extreme Ink Tattoo employee testified that the video showed Petitioner enter the tattoo shop on October 14, 2011, asking for a quote to cover up tattoos around his neck and on his forearms. Id. at 834-35. Petitioner did not have his tattoos covered up that day because he did not have the money for it. Id. at 835.

In addition to obtaining surveillance videos, investigators obtained and analyzed physical evidence from the scene, the van, the victim, and Petitioner himself. A detective with the OPD investigated the scene the day after the

incident, on October 13, 2011. Id. at 660. On the dirt road leading to the location where Petitioner parked the van, officers located articles of clothing laying on top of some brush. Id. at 661-62. At trial, the detective identified the recovered clothing: jeans, underpants, a bra, and a shirt. Id. at 663-65, 669-70.[8] When the victim testified, she identified the recovered clothing as the ones she was wearing the night of the incident. Id. at 605-08.

At the scene, officers also found a piece of plastic and what appeared to be drops of blood. Id. at 662-63, 666. Officers thought the piece of plastic was from a vehicle, so they brought it to a nearby Chrysler-Jeep dealership to inquire. Id. at 679-80. The employee at that dealership who was asked to identify the plastic piece testified at trial. Id. at 657. He identified the plastic piece as a part to a van: "the upper sliding door hinge cover." Id. at 658. The witness testified the door hinge cover he was asked to identify fit both Chrysler Town & Country vans and mid-90's Dodge Caravans, id., which is the make of the van Petitioner borrowed from his father-in-law, id. at 587, 869. Additionally, the employee testified that when he received a vehicle identification number, he confirmed the plastic piece "did, exactly, fit that van with that . . . number." Id. at 659. Petitioner's father-in-law testified at trial. Id. at 691. He confirmed that he loaned Petitioner his van in October 2011. Id.

_____

[8] The OPD crime scene technician who photographed, documented, and collected physical evidence at the scene testified at trial. Doc. 27-1 at 682-83.

at 696-97. When he received the van back, he noticed a scratch on the door and one on the front bumper. Id. at 698. He later noticed cuts inside on the seats and the ceiling. Id. at 699.

An OPD crime scene technician visually inspected the barricades located at the end of 44th Avenue near Cone Distributing and noticed "a corner of the lower plank on [the] barricade appeared to have been in contact with a vehicle." Id. at 809. The technician cut that portion of plank away from the barricade to collect it as evidence. Id. at 809-10. That same technician also processed the green van. Id. at 811. At trial, the technician identified pictures she took during her investigation and testified that she noted a scrape on the bumper of the van, which appeared to be paint transfer. Id. at 812, 814. She said the paint transfer was consistent with the plank she recovered from the barricade. Id. at 814.

The technician also observed blood on the front passenger seat, the center console, and "pretty much throughout the interior of the van," including on the back of the steering wheel. Id. at 814-17. In addition to finding blood spots inside the van, the technician identified other body fluids on the interior and exterior, which could have been semen, saliva, or sweat. Id. at 823, 825-26. The technician observed something "odd" with the sliding door, noting a piece was missing. Id. at 818. She compared the sliding door with the plastic piece recovered from the scene of the crime and determined "[the plastic piece]

came from [that] vehicle." Id. at 819. Finally, the technician observed that the left front tire was a different brand than the other three, so she took photos of it. Id. at 820.

Another crime scene technician collected and examined the left front tire. Id. at 827-28.[9] A crime laboratory analyst with the Florida Department of Law Enforcement (FDLE) "assigned to the impression evidence section" testified that she reviewed pictures of tire impressions taken by officers who investigated the scene and compared those to the tire removed from the green van. Id. at 840, 843-44. She concluded the "tire impression could have been made by the tire . . . based on similarities of tread, design, physical size, and noise treatment." Id. at 844-45.

Petitioner was brought to the station for questioning on October 20, 2011, eight days after the incident. Id. at 851. Excerpts of the video interview were played for the jury. Id. at 852. At the time of the interview, Petitioner had a cut on his head, which he said he got "fixing a vehicle." Id. at 877. Petitioner acknowledged he had borrowed his father-in-law's green Dodge Caravan the Wednesday before (the day of the incident) but said he only drove it to work

---

[9] When first called to the stand, the technician could not identify the tire because his signature was not on the evidence seal. Doc. 27-1 at 829. The witness was later re-called and identified the tire by "the label on the other side," which he said he had typed and created himself. Id. at 838. The tire was admitted into evidence. Id.

and then to Gainesville.[10] Id. at 857, 859, 880. He denied picking anyone up in the van. Id. at 859, 862-63. Officers asked him about tattoos and scars, noting he "match[ed] the description [of the suspect] to a T." Id. at 855, 877-78. One officer told Petitioner, "you do look similar. … [Y]ou've got the . . . scar and the tattoo. You've got the neck tattoo." Id. at 879-80. Additionally, officers told Petitioner the victim had identified him through a photo lineup. Id. at 882.

The officer who conducted the photo line-up testified that when she "turned the photo lineup over on the table, [the victim] basically hysterically started crying and she identified [Petitioner]." Id. at 712. The OPD crime scene technician who collected physical evidence from the victim immediately after the incident, including photos of her injuries and the bloody gauze, testified at trial. Id. at 737-39, 741. So did the crime laboratory analyst with the FDLE who tested the gauze for DNA. Id. at 742-43, 748. The FDLE witness testified that a comparison of DNA from the gauze and DNA obtained from Petitioner (a buccal swab) was "a match." Id. at 747, 754-755.

At the close of the State's case, defense counsel moved for a judgment of acquittal (JOA) on the armed kidnapping charge arguing there was no evidence Petitioner brandished or used a weapon when he forced the victim

---

[10] Petitioner's former employer testified that Petitioner quit on October 12, 2011, the day of the incident. Doc. 27-1 at 715. The witness testified that time sheets showed Petitioner "did not work that day." Id. at 715, 717. He checked in, but he quit and, therefore, did not clock in. Id. at 718.

into the van. Id. at 890. He explained the victim testified Petitioner first brandished the box cutter when he parked the van in the wooded area and sexually assaulted her. Id. at 890, 898. Counsel argued as follows:

> [T]he weapon didn't come out during the kidnap[p]ing. The kidnap[p]ing was complete once he stopped the car at the – at the place and did the sexual battery. There was no more – there was no more kidnap[p]ing because now that is inherent in the sexual battery that [the victim] [is] not leaving.

Id. at 892-93. After extensive discussion with both attorneys about the armed kidnapping charge, the judge denied the motion for JOA. Id. at 902.

The jury found Petitioner guilty of one count of armed kidnapping and three counts of sexual battery with great force, as charged in the amended information. Id. at 995; Doc. 27-2 at 343-46. The trial court sentenced Petitioner to a term of life imprisonment on all four counts. Doc. 27-2 at 353, 358-61. An attorney with the Public Defender's Office filed an Anders[11] brief on Petitioner's behalf, raising two potential issues: one related to the armed kidnapping charge and the other related to the trial court's admission of photographs of the victim's genitals. Doc. 27-1 at 1020-21. The Fifth District Court of Appeal (Fifth DCA) notified Petitioner he could submit a pro se brief. Id. at 1056. Petitioner requested and received two extensions to file a brief,

---

[11] Anders v. California, 386 U.S. 738 (1967).

though ultimately, he did not do so. <u>Id.</u> at 1061, 1063. The Fifth DCA per curiam affirmed the convictions without a written order. <u>Id.</u> at 1065.

Petitioner sought postconviction relief in the trial court, filing an amended motion under Florida Rule of Criminal Procedure 3.850 (Rule 3.850 Motion).[12] Doc. 27-3 at 72. Petitioner also filed a Petition for Writ of Habeas Corpus under Rule 9.141 of the Florida Rules of Appellate Procedure (Rule 9.141 Motion) in the Fifth DCA arguing his appellate counsel was ineffective for failing to raise certain issues on appeal and that the appellate court, on direct review, "overlooked or misapprehended facts or issues." Doc. 27-1 at 1230-31. The Fifth DCA denied Petitioner's Rule 9.141 Motion. Doc. 27-3 at 32.

The postconviction court set an evidentiary hearing on Petitioner's Rule 3.850 Motion, and Petitioner requested counsel.[13] <u>Id.</u> at 158-59. The evidentiary hearing began on May 5, 2017. <u>Id.</u> at 164. It was continued for a second day and resumed on May 19, 2017. <u>Id.</u> at 305. In all, the evidentiary hearing lasted nearly five hours. <u>See id.</u> at 969. The postconviction court denied Petitioner's Rule 3.850 Motion by written order dated March 19, 2018. <u>Id.</u> at 545. After his motion for rehearing was denied, <u>id.</u> at 915, Petitioner appealed

---

[12] The trial court dismissed Petitioner's initial filings because Petitioner failed to comply with the applicable rules of procedure. Doc. 27-3 at 48-49.

[13] The court did not appoint counsel for Petitioner for his postconviction proceedings. In his Petition before this Court, Petitioner contends the court's refusal to appoint him counsel deprived him of due process. <u>See</u> Sec. Am. Pet. at 79.

to the Fifth DCA, id. at 921. The Fifth DCA per curiam affirmed without written order and issued its mandate. Id. at 1101, 1103.

## V. Analysis

### A. Grounds One through Nine

Petitioner notes that grounds one through nine were those he raised in his Rule 9.141 Motion. Sec. Am. Pet. at 3-6, 12-22. He sets forth those grounds in what he labels "Exhibit D." Id. at 13-22. Respondents contend that "nowhere under grounds 1-9 . . . does [Petitioner] claim that appellate counsel was ineffective for failing to raise [certain] claims on appellate review." Resp. at 11. Accordingly, they contend, Petitioner has not exhausted these claims. Id. Alternatively, they assert Petitioner's assertions are vague, and he raises only issues of state law. Id. at 22-23.

Respondents are correct that Petitioner does not explicitly assert appellate counsel was ineffective in grounds one through nine as written in Exhibit D. See Sec. Am. Pet. at 14-22. He writes these grounds as if he is complaining about errors committed by the trial court or the prosecutor. Id. However, Petitioner explains in his Petition that grounds one through nine are a re-statement of the grounds he raised in his Rule 9.141 Motion in which he asserted his appellate counsel was ineffective for failing to raise various issues on appeal. Id. at 3. In comparing the grounds raised in Petitioner's Rule 9.141 Motion with those raised in Exhibit D of his Petition and based on Petitioner's

assertion that the grounds in his Petition are intended to be those he raised in his Rule 9.141 Motion, the Court construes the grounds raised in Exhibit D as raising ineffective-assistance-of-appellate-counsel claims. Therefore, the Court will address them as such. Cf. id. at 14-22 with Doc. 27-1 at 1230-69.

Before doing so, however, the Court notes that Petitioner's grounds in Exhibit D are vague, confusing, and somewhat redundant. They lack precise factual explanation. The Court will summarize the arguments as best they can be discerned and will address them somewhat out of order because some are duplicative or related. The Court will supplement the summary of Petitioner's claims by referencing his Rule 9.141 Motion where necessary.

### i.   Ground One

In ground one, Petitioner complains his appellate attorney was ineffective for failing to argue the trial court erred by not conducting a proper Richardson[14] hearing after it was discovered the State withheld evidence. Sec. Am. Pet. at 14-15. Petitioner raised this claim as ground I of his Rule 9.141 Motion. Doc. 27-1 at 1232, 1240. In its answer brief to Petitioner's Rule 9.141 Motion, the State explained the alleged discovery violation related to a written statement from the victim, which she appeared to have been consulting while testifying at trial. Doc. 27-2 at 4.

---

[14] Richardson v. State, 246 So. 2d 771 (Fla. 1971).

### a. Relevant Facts

On direct examination, the victim explained how Petitioner forced her into the van: "[W]hen I got to the corner, the van just started driving real fast towards my way and just stopped immediately …. A man got out, ran around it and just grabbed me through the hair and put me in the van." Doc. 27-1 at 586-87. On cross-examination, defense counsel questioned the victim about a discrepancy between her trial testimony and the statement she gave to police. Id. at 636. The victim told police officers the day after the incident that Petitioner stopped the van, "opened the door, and grabbed [her] through [her] hair and dragged [her] in[side]." Id. at 637. The victim testified as follows at trial:

> Q    . . . [T]ell the jury what you told the police officers the next day. . . .
>
> A    . . . [H]e just . . . stopped and . . . opened the door, and grabbed me through my hair and dragged me in.
>
> Q    And you don't say anything about him getting out o[f] the car, right?
>
> A    No, sir. But I'm pretty sure I did.
>
> …
>
> Q    . . . Do you want to read to the jury what you said that day, the day after this . . . allegedly happened[?]

A        . . . [I]t was very easy for him to flip over and open the door and just put me – drag me in there without having . . . to really get off the truck.

Q        Keep going.

A        But just like . . . slide himself over to the passenger side. That's all he did and popped the door open right there.

…

Q        . . . So that's different than what you said here today, is that correct?

A        Yes, sir.

Q        So apparently the day after this happened, you were close enough to the van to where all that had to happen was [Petitioner] reach over and pull you into the truck, right?

A        No, sir.

Q        So you were lying that day? You lied to the police?

A        I was nervous. I had had sedatives [at the hospital]. I was confused.

Id. at 637-39.

On re-direct examination, the prosecutor attempted to rehabilitate the victim by asking her about her deposition testimony, which the prosecutor told the judge at sidebar was consistent with her trial testimony. Id. at 679-50. In questioning the victim, the prosecutor asked whether she had reviewed her "interview and [her] deposition," and whether she had taken notes about those.

27

Id. at 648. She said she had, and when she began to consult those notes, Petitioner's lawyer objected on the grounds of "a discovery violation." Id.

At sidebar, the prosecutor told the judge he did not disclose the victim's notes to defense counsel because she wrote them herself based on a review of her own police interview and deposition testimony. Id. at 649. The prosecutor said, "I did not disclose it because [defense counsel] had her testimony in the deposition." Id. After the discussion at sidebar, the prosecutor resumed his questioning and asked the victim to clarify how Petitioner forced her into the van. Id. at 650-51. Defense counsel did not further object. Id.

The prosecutor asked the victim, "[D]id you talk about how you got into the vehicle [at your deposition]?" Id. The victim responded "yes" and explained that she said she "was forced into the vehicle," and that Petitioner was "outside of the vehicle." Id. at 651. She said, "He pulled me and he . . . came around and he put me in the vehicle." Id. at 650.

### b. Party's Positions

Petitioner says a Richardson hearing was required because the trial court was alerted to a possible discovery violation. Sec. Am. Pet. at 14. He said neither the trial judge nor defense counsel reviewed the victim's handwritten "statement to decide if its contents would establish that a santion [sic] [was] necessary." Id. In its response to Petitioner's Rule 9.141 Motion, the State argued that the issue had not been preserved for appeal because Petitioner's

28

lawyer "made no further mention of a possible discovery violation, thus waiving/abandoning any possible issue in this regard." Doc. 27-2 at 4. Additionally, the State noted there was "no discovery violation" and, thus, no need for a <u>Richardson</u> hearing. <u>Id.</u> at 4-5.

### ii.   Ground Three

In ground three, Petitioner complains his appellate attorney was ineffective for failing to argue the trial court erred by giving the standard jury instruction that defines "reasonable doubt" because the instruction uses the word "should" instead of "must." Sec. Am. Pet. at 16. Petitioner raised this claim in ground IIA of his Rule 9.141 Motion. Doc. 27-1 at 1232, 1243. In its answer brief to Petitioner's Rule 9.141 Motion, the State framed the issue as follows: "[Petitioner] argues that the Florida Standard Jury Instruction on reasonable doubt shifts the burden of proof, by stating that if the jurors have a reasonable doubt they 'should' (rather than 'must') find the defendant not guilty." Doc. 27-2 at 5-6. The State argued the issue was meritless because the Third and Fourth DCAs had expressly rejected the argument. <u>Id.</u> at 6. The State noted the Fifth DCA had not addressed the issue. <u>Id.</u>

### iii.   Ground Four

In ground four, Petitioner complains his appellate attorney was ineffective for failing to argue the trial court erred by giving the standard jury instruction defining "serious physical injury" because the definition is

"ambiguous." Sec. Am. Pet. at 17. Petitioner raised this claim in ground IIB of his Rule 9.141 Motion. Doc. 27-1 at 1232, 1246. Petitioner argued in his state brief that the standard jury instruction defining "serious personal injury" is ambiguous and "shifts the burden to the [defendant] to disprove an element." Id. at 1246. The State argued in its answer brief that the claim was not preserved for appeal because "trial counsel did not object to the jury instruction." Doc. 27-2 at 6. The State also recounted the evidence of the victim's injuries:

> The victim testified that the [Petitioner] beat her head against the window of his van, used a box cutter to threaten her, inserted his finger into her vagina and anus, and penetrated her vagina with several metal tools, 'stabbing' them into her vagina several times and causing the lips of her vagina to tear. A forensic sexual assault examiner testified that the victim had a large hematoma filled with fluid and blood on the labia area of the vagina which was 'very painful' to examine, and that she had a contusion and swelling around the left side of her face and eye.

Id. (internal citations omitted).[15]

### iv.   Ground Five

In ground five, Petitioner complains his appellate attorney was ineffective for failing to argue the prosecutor "used fraud to procure a desired ruling" during the Williams Rule hearing. Sec. Am. Pet. at 18. He contends the

---

[15] The victim also testified at trial that she had "three surgical procedures" to repair the damage to her vagina. Doc. 27-1 at 612.

prosecutor "l[ied] to . . . and misle[d] the court[] to [demonstrate] identity of the alleged attacker [was] of no issue in any of the collateral crimes."[16] Id. Petitioner raised this claim in ground IIIA of his Rule 9.141 Motion. Doc. 27-1 at 1232, 1250. In his state brief, Petitioner argued the prosecutor incorrectly informed the trial court one of the other victims had identified Petitioner as the perpetrator, but "in fact there [was] multiple [sic] evidence the state witness did not identify the Petitioner to be the person to allegedly assault the witness." Id. at 1251.

In its answer brief to Petitioner's Rule 9.141 Motion, the State argued that since the trial court ruled the collateral crimes evidence was not admissible during the State's case-in-chief, and neither of the other alleged victims testified at trial, Petitioner could not show appellate counsel was deficient for failing to raise the issue on appeal, nor could he demonstrate prejudice. Doc. 27-2 at 8-9.

## v.   Grounds Six and Seven

Petitioner complains his appellate attorney was ineffective for failing to argue the prosecutor's late amendment to the information prejudiced his

---

[16] Petitioner seems confused by what the trial judge and prosecutor meant when they acknowledged during the Williams Rule hearing that there was no issue of "identity." The prosecutor conceded the collateral crimes evidence was not being offered to establish the perpetrator's "identity" because there was DNA evidence linking Petitioner to the crime in this case. Doc. 27-1 at 392-93, 396. In the context of the Williams Rule motion, the discussion regarding the issue of "identity" was not about whether Petitioner had been identified by the other alleged victims (J.M. or T.R.).

defense because the prosecutor only highlighted two changes when in fact there were three (ground six) and because the State bifurcated one claim, which ambushed the defense (ground seven). Sec. Am. Pet. at 19-20. Petitioner raised these claims in ground IV of his Rule 9.141 Motion. Doc. 27-1 at 1233, 1256.

### a. Relevant Procedural Facts

Petitioner was charged in an amended information with four counts: armed kidnapping (Count I); and three counts of sexual battery (Counts II through IV). The State filed the amended information on the day of trial. Doc. 27-1 at 473. As to the kidnapping charge (Count I), the original information charged Petitioner under Florida Statutes 787.01(1) and 775.087(1) with abducting the victim "with the intent to [i]nflict bodily harm upon or to terrorize [her] and, during the commission of said kidnapping, [Petitioner] carried, displayed, used, threatened or attempted to use a weapon. . . ." Doc. 27-2 at 54.

The amended information charged Petitioner under the same statutory provisions with abducting the victim "with the intent to commit or facilitate the commission of a felony, to wit: Sexual Battery, or with the intent to inflict bodily harm upon or to terrorize [the victim] and, during the commission of said kidnapping, [Petitioner] carried, displayed, used, threatened or attempted to use a weapon. . . ." Id. at 55 (emphasis added). As the prosecutor explained,

the armed kidnapping charge was modified only to add the phrase, "with the intent to commit or facilitate the commission of a felony, to wit: Sexual Battery," and to add the word "or" after that phrase. Doc. 27-1 at 473. The State modified the charge so it would align with the language of the jury instructions. Id.

The original information charged Petitioner in Count III with sexual battery against a person over twelve by "causing his finger(s) or a(n) object(s) to unite with or penetrate the <u>vagina or anus</u> of [the victim]." Doc. 27-2 at 54 (emphasis added). In the amended information, the State charged Petitioner under separate counts: one for penetration of the victim's vagina (Count III); and one for penetration of the victim's anus (Count IV). Id. at 55-56. The prosecutor addressed and explained this change for the judge and defense counsel. Doc. 27-1 at 483-84.

Finally, the original information charged Petitioner with two counts of sexual battery as follows: "[Petitioner] did unlawfully commit a sexual battery upon [the victim] . . . without the said person's consent . . . and in the process thereof, used or threatened to use a deadly weapon, to wit: box cutter, in violation of Florida Statute 794.011(3) and 794.011[(5)](2)(b)." Doc. 27-2 at 54. In the amended information, the State added language to the last phrase: "[Petitioner] … used or threatened to use a deadly weapon, to wit: box cutter, <u>or used actual physical force likely to cause serious personal injury</u>, in violation

of Florida Statute 794.011(3) and 794.011[(5)](2)(b)." Id. at 55 (emphasis added). The prosecutor did not highlight this final change for the court or defense counsel when he summarized the changes to the information. Defense counsel objected only to the changes specifically discussed on the record.

Defense counsel, however, "strenuously [objected]" to the amended information being filed on the morning of trial. Doc. 27-1 at 473, 475. The trial judge overruled the objection, noting the State merely amended the "allegations [to be] consistent with the facts," which Petitioner and counsel had "been aware of . . . for months." Id. at 478, 483. With respect to the bifurcation of the sexual battery count, the judge noted Petitioner was not "charg[ed] . . . with something new." Id. at 485. The judge informed defense counsel he could raise any factual sufficiency issues on a motion for JOA but observed the facts supporting the State's case had already been fully disclosed. Id. at 478-80, 483, 486.

### b. Party's Positions

Petitioner complains the amended information prejudiced his defense and, therefore, should have been briefed on direct appeal, because the prosecutor only summarized two changes when in fact there were three and because the bifurcation of one count of sexual battery was an attempt to "ambush" the defense. Sec. Am. Pet. at 19-20. See also Doc. 27-1 at 1233, 1256-59. Though not stated explicitly in his Petition, Petitioner argued in his state

34

brief that the language added to the sexual battery Counts—"or used actual physical force likely to cause serious physical injury"—prejudiced him because he did not have "an expert to refute the allegations of injuries sustained post attack." Id. at 1259. He stated in his reply brief that "[t]he defense never had a chance to officiate [sic] the alleged surgeries nor get an expert to contest the now material post [incident] injuries." Doc. 27-3 at 10.

In its answer brief to Petitioner's Rule 9.141 Motion, the State recounted the trial court's discussion with the attorneys about the amended information and cited law that provides an amended information is permissible on the day of trial "when it merely clarifies some detail of the existing charge and could not reasonably have caused the defendant any prejudice." Doc. 27-2 at 10-11.

### vi. **Grounds Two, Eight, and Nine**

In ground two of his Petition, Petitioner appears to complain about a purported discovery violation and the impact that discovery violation may have had on the Williams evidence ruling. Sec. Am. Pet. at 15. The ground is exceedingly confusing. Petitioner contends, in part, as follows:

> During the trial proceedings the prosecutor asked the alleged victim if she remember [sic] writing a statement after reading her prior statements [to police] and depositions. [Defense] counsel immediately objected to a discovery violation. In the said colloquy the [prosecutor] acknowledge that the written statement was to explain why the facts of the victims [sic] statements and depositions have descrepencies [sic].

> Because the court had use [sic] the statements and depositions that had descepencies [sic] and the failure to supply the court with the newest statement explaining such descrepencies [sic] at the Similar Crimes Limine,[17] the court made its findings by clear and convincing evidence with evidence that would not be distinctly remembered, because the details in connection with the transaction clearly changed.

Id. It appears Petitioner takes issue with the trial court concluding it found by "clear and convincing evidence" that Petitioner had committed the prior similar crimes, suggesting the trial court's ruling would have been different if the court had known that the victim in this case gave conflicting accounts of how she got into Petitioner's van on the day of the incident. See id.

Similarly, in ground eight, Petitioner complains his appellate attorney was ineffective for failing to argue the trial court erred in its ruling on the Williams Rule evidence because the court did not have the benefit of the victim's conflicting statements. Id. at 21. Petitioner contends the court's ruling was "not supported by nothing except the [prosecutor's] false lies and counsels [sic] erroneous concedingness [sic]." Id.

Finally, in ground nine, Petitioner complains his appellate attorney was ineffective for failing to argue the prosecutor did not carry his burden to demonstrate the collateral crimes evidence was admissible because the

---

[17] Petitioner refers to the Williams Rule hearing as a "collateral/similar crimes limine."

36

prosecutor relied solely on the bare language of the statute and did not present case law. Id. at 22.

Petitioner raised these claims in grounds IIIB, V, and VI of his Rule 9.141 Motion. Doc. 27-1 at 1233, 1262-65. In its answer brief to Petitioner's Rule 9.141 Motion, the State noted Petitioner's trial attorney "effectively cross-examined [the victim] at trial concerning the various inconsistencies and contradictions in her statements," and Petitioner was not prejudiced by the Court's Williams evidence ruling because no collateral crimes evidence was admitted at trial. Doc. 27-2 at 9, 12.

### vii.   Analysis of Grounds One Through Nine

Based on the briefs submitted by the parties, the Fifth DCA denied Petitioner's Rule 9.141 Motion. Doc. 27-3 at 32. The Fifth DCA's adjudication of these claims is entitled to AEDPA deference. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claims was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d).

Even if the Fifth DCA opinion were not entitled to deference, however, Petitioner's claims are without merit. He has not demonstrated he would be entitled to relief under Strickland. Indeed, he does not explain or offer

argument why his appellate attorney's performance was deficient or prejudicial. See Sec. Am. Pet. at 14-22. In assessing "whether there is any reasonable argument that counsel satisfied Strickland's . . . standard," Richter, 562 U.S. at 105, the Court gives considerable deference to appellate counsel's strategic decision to identify issues for appeal. Petitioner's appellate attorney filed an Anders brief. Under Anders, "if [appellate] counsel finds [the] case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. . . . accompanied by a brief referring to anything in the record that might arguably support the appeal." 386 U.S. at 744.

In his Anders brief, Petitioner's appellate attorney detailed the factual and procedural background, summarizing the testimony of all eighteen witnesses who testified on behalf of the State. Doc. 27-1 at 1025-44. The attorney identified two possible issues for appellate review: whether the trial court erred in submitting the armed kidnapping charge to the jury given there was no evidence of a weapon being used or displayed before the sexual battery occurred; and whether Petitioner was unduly prejudiced by the trial court's ruling permitting the State to publish to the jury graphic pictures of the victim's genitalia, which were disclosed late. Id. at 1046-47. In accordance with Anders, the attorney sought to withdraw but noted he would provide

supplemental briefing on any issue "[s]hould the court in its independent review find an issue to be arguable on the merits." Id. at 1045, 1050, 1053-54.

The State filed a notice of intent not to file a response brief. Id. at 1058. Petitioner was advised of his right to submit a pro se brief, and he was given extensions of time in which to do so, but he did not. Id. at 1056, 1061, 1063. Without requesting supplemental briefing on any issue, the Fifth DCA per curiam affirmed Petitioner's judgment and conviction. Id. at 1065.

An appellate lawyer has no obligation to raise every conceivable issue on appeal, and the failure to raise a meritless issue does not constitute ineffective assistance. See Owen, 568 F.3d at 915. In fact, "an attorney, whether appointed or paid, is . . . under an ethical obligation to refuse to prosecute a frivolous appeal." McCoy v. Ct. of Appeals of Wisconsin, Dist. 1, 486 U.S. 429, 436 (1988). Moreover, an appellate attorney who files a compliant Anders brief, even if only marginally compliant, does not render ineffective assistance. Grubbs v. Singletary, 120 F.3d 1174, 1177 (11th Cir. 1997) (concluding the district court erred in finding appellate counsel rendered ineffective assistance of counsel by filing only a marginally compliant Anders brief).

Here, Petitioner's appellate attorney's brief was compliant with Anders, and his "conscientious examination of [the record]" is evident by his detailed summary of the procedural history and evidence. Doc. 27-1 at 1025-44. Counsel's independent decision not to raise other potential issues for the

appellate court's review does not suggest or even permit the inference that counsel's performance was deficient. Additionally, pursuant to its obligation under <u>Anders</u> and <u>State v. Causey</u>, 503 So. 2d 321 (1987),[18] the Fifth DCA independently reviewed the record and found no errors worthy of review or reversal. As such, even if Petitioner's appellate counsel's performance had been deficient, Petitioner cannot demonstrate prejudice because he would be unable to show "the neglected claim[s] would have [had] a reasonable probability of success on appeal." <u>See</u> <u>Philmore</u>, 575 F.3d at 1264-65. Accordingly, grounds one through nine are denied.

**B. Grounds Ten through Twenty-Three**

In grounds ten through twenty-three, Petitioner raises claims he asserted in his Rule 3.850 Motion. Sec. Am. Pet. at 7, 27. These grounds are somewhat confusing and, at times, repetitive. Most are vague, lacking in factual context or support. As such, in summarizing these grounds, the Court will reference Petitioner's Rule 3.850 Motion and summarize the postconviction court's rulings.

---

[18] In <u>Causey</u>, the Florida Supreme Court held, when an <u>Anders</u> brief is filed on behalf of an indigent criminal appellant, "the appellate court must examine the record to the extent necessary to discover any errors apparent on the face of the record." 503 So. 2d at 322.

### i. Ground Ten

In ground ten, Petitioner asserts his trial counsel was ineffective for failing to ensure the jurors were not biased or failing to move for a change in venue. Id. at 29. Petitioner raised this ground as ground one in his Rule 3.850 Motion. Doc. 27-3 at 73. In ruling that defense counsel was reasonable in deciding not to file a motion to change venue, the postconviction court quoted extensively from the transcripts of the Williams Rule hearing and the evidentiary hearing, at which the court and the attorneys discussed media attention. Id. at 520-24. The court found trial counsel reasonably determined there were no grounds upon which to move for a change in venue and noted that counsel took steps to ensure negative media attention did not unfairly prejudice the defense. Id. at 520, 524.

Counsel not only filed a motion in limine asking that "all witnesses . . . refrain from referring to the [Petitioner] as 'the Ocala Serial Rapist,'" which was granted, but counsel also ensured the trial judge questioned the jurors … and asked the judge to "admonish [them] that if they [were to] at some point [during the trial] remember anything [from the news about the case] to come forward and let [the court] know." Id. at 520-21. Additionally, counsel testified at the evidentiary hearing that "all the prospective jurors testified they could be fair," even though some had heard about the case, counsel and Petitioner had the "opportunity to discuss each and every juror prior to selecting them,"

and counsel struck the jurors Petitioner told counsel he did not want on the jury. Id. at 522-23. The postconviction court ruled, "the [Petitioner] . . . failed to produce evidence of any difficulty in selecting a jury or other evidence demonstrating that there was a reasonable probability that the trial would have, or at lest should have, granted a change of venue motion." Id. at 524.

### ii.      Ground Eleven

In ground eleven, Petitioner asserts his trial counsel was ineffective for failing to request a competency hearing. Sec. Am. Pet. at 30. Petitioner raised this ground as ground two in his Rule 3.850 Motion. Doc. 27-3 at 77. The postconviction court ruled Petitioner failed to show by clear and convincing evidence that there was a "real, substantial and legitimate doubt as to [his] competency." Id. at 525. The court referenced defense counsel's testimony at the evidentiary hearing that, in all his meetings with Petitioner, he never was concerned about Petitioner's competency to proceed to trial and, had he noticed something, he would have filed an appropriate motion. Id. at 524-25. The court also noted Petitioner's own statements at the evidentiary hearing about his alleged mental issues were "evasive" and, at times, "directly refuted by the record." Id. at 525.

### iii.      Grounds Twelve & Thirteen

In grounds twelve and thirteen, Petitioner asserts his trial counsel was ineffective by being "undeniably unprepared for the collateral crimes limine"

(ground twelve), <u>see</u> Sec. Am. Pet. at 31, and failing to "readdress the collateral crimes ruling based on the discovery of a statement that would demonstrate the statement and depositions used in the limine are not accurate and consist of conflicting and contradicting events" (ground thirteen), <u>id.</u> at 32.[19] Petitioner raised grounds twelve and thirteen as ground three in his Rule 3.850 Motion. Doc. 27-3 at 78. The postconviction court attached to its order its ruling on the <u>Williams</u> Rule evidence and quoted extensively from the transcript of the hearing. <u>Id.</u> at 526-28. The court ruled that, even if counsel had been unprepared for the <u>Williams</u> Rule hearing, such conduct did not prejudice his defense because no "<u>Williams</u> Rule evidence was presented to the jury." <u>Id.</u> at 528.

### iv.   Ground Fourteen

In ground fourteen, Petitioner asserts his trial counsel was ineffective for advising Petitioner not to testify in consideration of the trial court's ruling on the collateral crimes evidence. Sec. Am. Pet. at 33. Petitioner raised this ground as ground four in his Rule 3.850 Motion. Doc. 27-3 at 80. The postconviction court ruled Petitioner's suggestion that his attorney coerced him not to testify was without merit because "[Petitioner] knowingly, voluntarily, and intelligently waived his right to testify on the record." <u>Id.</u> at

---

[19] Ground thirteen is exceedingly confusing. It appears Petitioner is referring to the victim's contradictory statements made to police and at trial.

530. The court further found counsel's advice that Petitioner not testify was reasonable and tactical under the circumstances—that the <u>Williams</u> Rule evidence may be admissible if Petitioner were to testify as he planned, and that counsel thought Petitioner's argumentative nature "would look poorly in front of the jury." <u>Id.</u> at 530-31.

### v.    Ground Fifteen

In ground fifteen, Petitioner asserts his trial counsel was ineffective for failing to properly convey a plea deal offered by the State and improperly conveying or making a counteroffer. Sec. Am. Pet. at 34. Petitioner raised this ground as ground five in his Rule 3.850 Motion. Doc. 27-3 at 81. The postconviction court found Petitioner's claim meritless because the State had extended no offer to Petitioner until just days before trial—at the <u>Williams</u> Rule hearing and in Petitioner's presence. <u>Id.</u> at 532. On the record, the State offered Petitioner 40 years as a global offer on his three cases. <u>Id.</u> Defense counsel noted that if Petitioner were to be convicted as charged, he would get a life sentence. <u>Id.</u> at 533. The court told Petitioner he and his attorney could have time—off the record and privately—to discuss the offer. <u>Id.</u> at 534. Petitioner responded, "No, I'm rejecting." <u>Id.</u> The postconviction court found the record directly refuted Petitioner's claim and, thus, denied it. <u>Id.</u> at 536.

### vi.  Ground Sixteen

In ground sixteen, Petitioner asserts his trial counsel was ineffective for failing to object to deposition testimony or out-of-court statements offered at the <u>Williams</u> Rule hearing. Sec. Am. Pet. at 35. Petitioner raised this ground as ground six in his Rule 3.850 Motion. Doc. 27-3 at 83. The postconviction court ruled that, even if defense counsel was deficient by not objecting to the introduction of hearsay testimony at the <u>Williams</u> Rule hearing, Petitioner failed to establish prejudice because "no <u>Williams</u> Rule evidence was presented at trial." <u>Id.</u> at 536-37.

### vii.  Ground Seventeen

In ground seventeen, Petitioner asserts his trial counsel was ineffective for conceding Petitioner's guilt in his closing argument. Sec. Am. Pet. at 36. Petitioner raised this ground as ground seven in his Rule 3.850 Motion. Doc. 27-3 at 84. In noting the context in which defense counsel made the allegedly improper comment during his closing argument was relevant, the postconviction court attached the entirety of the closing argument transcript to its order on Petitioner's Rule 3.850 Motion. <u>Id.</u> at 537. After reviewing the entire closing argument, the court ruled defense counsel's argument was proper. <u>Id.</u> The court observed:

> [T]rial counsel did not concede the [Petitioner] committed a sexual battery—indeed, trial counsel stated specifically that it was up to the jury to decide

whether a sexual battery occurred. Trial counsel's only argument pertaining to lesser-included offenses was that the evidence did not support the armed kidnapping charge. Based on the review of the record, this Court finds the [Petitioner's] seventh ground to be without merit.

Id.

### viii.   Ground Eighteen

In ground eighteen, Petitioner asserts his trial counsel was ineffective for failing to cross-examine the witness from the tattoo shop and failing to show the surveillance video footage from the tattoo shop at trial. Sec. Am. Pet. at 37. Petitioner contends the video footage would have demonstrated the witness "lie[d] in his statement to the detectives." Id. Petitioner raised this ground as ground eight in his Rule 3.850 Motion. Doc. 27-3 at 85. The postconviction court ruled that defense counsel's decision not to publish to the jury the video footage was reasonable and tactical. Id. at 538. The court noted defense counsel testified at the evidentiary hearing that there would be nothing gained from showing the video, and "he believed the video surveillance footage would . . . cast the [Petitioner] in a poor light, as it showed [him] in the tattoo parlor with his children." Id.

### ix.   Ground Nineteen

In ground nineteen, Petitioner asserts his trial counsel was ineffective for failing to comprehensively review the amended information or compare it

to the original information so as to "prevent the [S]tate's ambush." Sec. Am. Pet. at 38. Petitioner raised this ground as ground nine in his Rule 3.850 Motion. Doc. 27-3 at 87. The postconviction court ruled that, had defense counsel rendered deficient performance by not objecting to the added language to each of the sexual battery counts (regarding physical injury), Petitioner failed to demonstrate the amended information prejudiced his defense. Id. at 538-39. The court noted the original information specifically referenced the relevant statutes, thus putting Petitioner "on notice of the crime being charged." Id. at 539.

Additionally, the State presented evidence at trial that Petitioner both used a deadly weapon and actual physical force, and the jury was instructed on both alternatives, finding Petitioner guilty as charged. Id. In other words, the court ruled, "the evidence supported a verdict based on either 'use of a deadly weapon' or 'use of force likely to cause great bodily injury.'" Id.

### x.   Ground Twenty

In ground twenty, Petitioner asserts his trial counsel was ineffective for failing to object to hearsay testimony offered by the witness from the Dodge dealership, who testified that he had conferred with "his sources." Sec. Am. Pet. at 39. Petitioner raised this ground as ground ten in his Rule 3.850 Motion. Doc. 27-3 at 88. The postconviction court ruled Petitioner's claim was meritless because the relevant testimony was not in fact "hearsay." Id. at 541. The court

found defense counsel was not ineffective for "failing to raise a meritless objection." Id.

### xi.    Ground Twenty-One

In ground twenty-one, Petitioner asserts his due process rights were violated by counsel's cumulative errors. Sec. Am. Pet. at 40. Petitioner raised this ground as ground thirteen in his Rule 3.850 Motion. Doc. 27-3 at 91. Finding Petitioner's individual claims meritless, the postconviction court found the same as to the cumulative error claim. Id. at 543.

### xii.    Ground Twenty-Two

In ground twenty-two, Petitioner asserts his trial counsel was ineffective for failing to object to the State's expert witness's bolstering of her own testimony.[20] Sec. Am. Pet. at 41. Petitioner raised this ground as ground twelve in his Rule 3.850 Motion. Doc. 27-3 at 90. The postconviction court found Petitioner's claim meritless, noting he was "essentially complain[ing] that an expert witness provided an expert opinion." Id. at 543. Because the witness was asked to give her opinion regarding the victim's injuries, and she was permitted to do so under the relevant rules of evidence, defense counsel had no basis upon which to object. Id.

---

[20] Petitioner does not identify the expert by name, though it is clear he means the nurse who testified about the victim's injuries.

### xiii.  Ground Twenty-Three

In ground twenty-three, Petitioner asserts his trial counsel was ineffective for failing to object to the introduction of the tire removed from the green van because the State did not demonstrate the chain of custody. Sec. Am. Pet. at 42. Petitioner raised this ground as ground eleven in his Rule 3.850 Motion. Doc. 27-3 at 89. The postconviction court ruled that Petitioner's claim was meritless because the State witness who collected the tire from the green van, while initially unable to recognize the tire, "was recalled by the State and testified that he, in fact, recognized the tire" by the label that he himself typed and created. Id. at 542. The court noted, "Had trial counsel objected to the tire on the basis of lack of chain of custody, such an objection would have been overruled." Id.

### xiv.  Analysis of Grounds Ten through Twenty-Three

Respondents acknowledge that Petitioner raised grounds ten through twenty-three in his Rule 3.850 Motion. See Resp. at 12. However, Respondents argue these grounds are unexhausted because, following the state court's evidentiary hearing on Petitioner's Rule 3.850 Motion, Petitioner did not brief each issue on appeal. Id. at 12-14. Instead, they note, Petitioner set forth only the following in his appellate brief:

> Comes now the petitioner Michal Frye, pro se, files this initial brief to show the competent substantial evidence favorable to the petitioner

49

> establishing the lower tribunal's order is not
> conclusive. Moreover, due to the lower tribunal
> granting an evidentiary hearing on all grounds but
> failing to allow the petitioner a full and fair
> evidentiary to adequately argue the grounds, a full
> and fair evidentiary is the only remedy. None the less
> [sic] the petitioner relies on the filed judicial acts to be
> noticed (see exhibit A) as well as the motion for
> rehearing (see exhibit B).

Id. at 12. See also Doc. 27-3 at 921.[21]

In Florida, an appeal from a postconviction proceeding for which an evidentiary hearing was held requires briefs, and an appellant's failure to brief an issue on appeal constitutes abandonment of that issue. Fla. R. App. P. 9.141(b)(2), (3) (providing that "[b]riefs are not required" when a postconviction court rules on a motion without holding an evidentiary hearing, but that "briefs shall be served" when an appeal follows a grant or denial after an evidentiary hearing was held on at least one claim (emphasis added)). See also Prince v. State, 40 So. 3d 11, 12 (Fla. 4th DCA 2010) (holding the appellant waived on appeal issues he did not brief as error by the postconviction court); Ward v. State, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (refusing to address issues the appellant did not brief because the appellant "abandoned [those] issues by not addressing them").

---

[21] In exhibit A, Petitioner cited to pages in the transcript of the evidentiary hearing that contained facts he believed supported the grounds for relief he raised in his Rule 3.850 Motion. Doc. 27-3 at 927-36.

A Florida appellant waives arguments not briefed on appeal even if he relies on or references arguments he raised in postconviction motions. Deparvine v. State, 146 So. 3d 1071, 1094 (Fla. 2014) ("The purpose of an appellate brief is to present arguments in support of the points on appeal ... [and] to merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient to preserve issues." (alterations in original)); Duest v. Dugger, 555 So. 2d 849, 852 (Fla. 1990) (holding the appellant waived various postconviction claims on appeal because he merely referred to arguments he asserted in the postconviction court "without further elucidation"). See also Reaves v. Crosby, 837 So. 2d 396, 398 (Fla. 2003) (finding the appellant did not properly present a claim to the court for review because even though he raised the claim in a "cursory sentence," he wholly "fail[ed] to provide any argument relative to [the claim]"); Sutherland v. State, 305 So. 3d 776, 779 (Fla. 1st DCA 2020) (finding "insufficient" the appellant's mere "reli[ance] on the arguments made in his postconviction motion" to properly raise an issue on appeal).

A petitioner may not obtain federal habeas review on a claim he did not present to the "state's highest court, either on direct appeal or on collateral review." See Cortes v. Gladish, 216 F. App'x 897, 899-900 (11th Cir. 2007) (noting as dicta that a Florida petitioner who received an evidentiary hearing but did not brief an issue on appeal would waive the unbriefed issue). When a

Florida appellant does not brief an issue he wants the appellate court to review, he has not presented that issue to the state's highest court and, therefore, may not seek federal habeas review of the claim. See id. See also Rogers v. Sec'y, Dep't of Corr., No. 8:07-cv-1375-T-30TGW, 2010 WL 668261, at *53 (M.D. Fla. Feb. 19, 2010) (citing Cortes and finding the petitioner waived and procedurally defaulted his claim by not briefing it on appeal after receiving an evidentiary hearing in the state postconviction proceedings); Mathews v. Sec'y, Dep't of Corr., No. 8:08-cv-512-T-17MAP, 2008 WL 5111239, at *7 (M.D. Fla. Dec. 3, 2008) ("[I]n Florida, in non-summary proceedings, briefs are required and failure to include and argue any preserved issue in the initial brief acts as a waiver.").

In the postconviction court, Petitioner received an evidentiary hearing on his Rule 3.850 Motion. Doc. 27-3 at 164. As such, Petitioner was required to raise and address in his appellate brief each claim he wanted the appellate court to review. Although Petitioner filed an appellate brief, he did not brief the claims he raises in grounds ten through twenty-three of his habeas Petition. Petitioner's failure to fully brief and argue these issues on appeal constitutes a waiver of those claims. Thus, they are not exhausted and are now procedurally defaulted.

Petitioner appears to acknowledge his ineffective-assistance-of-trial-counsel claims are procedurally defaulted because he includes in his Petition a

"supplemental brief," which he labels, "Exhibit K: Martinez v. Ryan claims." Sec. Am. Pet. at 81-82 (internal punctuation and emphasis added). He requests that the Court overlook the procedural defaults because he did not have counsel to represent him in his state postconviction proceedings and his ineffective-assistance-of-trial-counsel claims have "some merit." Id. at 91.[22]

In Martinez, the Supreme Court held a lack of counsel or having ineffective counsel during initial-review collateral proceedings "may provide cause for a procedural default in a federal habeas proceeding." 566 U.S. at 9. The Court reasoned,

> Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when . . . the absence of an attorney[] caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel … may not have been sufficient to ensure that proper consideration was given to a substantial claim.

Id. at 14. The Court in Martinez carved out "a narrow exception to the general rule that the lack of an attorney or attorney error in state post[]conviction proceedings does not establish cause to excuse the procedural default of a substantive claim." Lambrix v. Sec'y Fla. Dept. of Corr., 851 F.3d 1158, 1164

---

[22] Petitioner lists nine reasons he believes he demonstrates "cause" and "prejudice" to overcome procedural default. Sec. Am. Pet. at 85-86. Those reasons are wholly unclear, though they appear to relate to the alleged ineffectiveness of his trial counsel. To the extent his reasons are decipherable, they appear to be restatements of some of the claims he raises in grounds ten through twenty-three.

(11th Cir. 2017). The exception applies in limited circumstances. Id. Under Martinez, a petitioner must demonstrate not only that he was denied effective postconviction counsel but also that he "failed to properly raise ineffective-assistance-of-trial-counsel claims during the initial collateral proceeding," and the ineffective-assistance-of-trial-counsel claim he now wishes to raise "is a substantial one, which is to say that the . . . claim has some merit." See id. (citing Martinez, 566 U.S. at 14). A claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." Martinez, 566 U.S. at 16.

The Eleventh Circuit has emphasized that the narrow Martinez exception applies only where a petitioner "failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceedings." Arthur v. Thomas, 739 F.3d 611, 629 (11th Cir. 2014). See also Lambrix, 851 F.3d at 1164. The narrow exception does not extend to "appeals from initial-review collateral proceedings." Martinez, 566 U.S. at 16 ("The holding in this case does not concern . . . other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts.").

In his Rule 3.850 Motion, Petitioner raised the ineffective-assistance-of-trial-counsel claims he asserts in grounds ten through twenty-three of his habeas petition. The postconviction court heard argument on those claims at an evidentiary hearing over two days and denied the claims on the merits. Doc.

54

27-3 at 164, 305, 545. Petitioner did not brief the issues on appeal, meaning he cannot benefit from the Supreme Court's holding in <u>Martinez</u>. Thus, grounds ten through twenty-three are unexhausted and procedurally defaulted, and Petitioner fails to demonstrate cause for and actual prejudice from the default or that a fundamental miscarriage of justice will result if these claims are not addressed on the merits. <u>See</u> <u>Ward</u>, 592 F.3d at 1157.

However, even if <u>Martinez</u> were to apply, or if Petitioner had exhausted these grounds for federal habeas review, they are insubstantial or meritless for the reasons stated in the postconviction court's order on Petitioner's Rule 3.850 Motion, as summarized previously in this Order. <u>See</u> Doc. 27-3 at 519-43. <u>See also</u> <u>supra</u> pp. 41-49.

Grounds ten through twenty-three are denied.

## C. Ground Twenty-Seven

Petitioner sets forth one additional ineffective-assistance-of-trial-counsel claim, which he did not raise in his Rule 3.850 Motion. He says this ground "became rippened [sic] during the evidentiary hearing." <u>Id.</u> at 43, 76. Petitioner contends as follows:

> [His] due process rights to a fair trial [were] violated by counsel's conflict of interest, by self preservation and concerns for his own representation when he failed to place the states [sic] evidence into adversarial testing, objecting, and presenting evidence and/or arguing meritorious arguments that would have at least preserved issues for appellate review.

Id. at 75. Petitioner adds "supporting facts," though they are vague and unclear. Id. He says his counsel made a "Freudian slip" by saying, "you don't argue with [J]udge [L]ambert," who was the trial judge.[23] Id.

Petitioner did not raise ground twenty-seven in his Rule 3.850 Motion. To the extent Martinez applies, Petitioner does not demonstrate the claim is a "substantial" one. On the contrary, the claim is "wholly without factual support." See Martinez, 566 U.S. at 16. Moreover, even if counsel could have more zealously argued the motion for JOA, such a proposition does suggest counsel's performance was deficient under Strickland. See White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992) ("The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done."). Ground twenty-seven is unexhausted and procedurally defaulted, and Petitioner fails to demonstrate cause for and actual prejudice from the default or that a fundamental miscarriage of justice will result if this claim is not addressed on the merits. See Ward, 592 F.3d at 1157.

---

[23] Petitioner offers no other facts, nor does he say when his counsel made this comment. A review of the record shows defense counsel made this comment at the evidentiary hearing. Doc. 27-3 at 337. It appears Petitioner construes the comment to mean counsel conceded that he (counsel) did not zealously argue the motion for JOA because, according to counsel, "you don't argue with [the trial judge who was assigned in that case]." See Sec. Am. Pet. at 75. See also Doc. 27-3 at 337. Counsel explained what he meant by that comment: "You prepare your case with [the trial judge] in mind." Id. at 338.

Alternatively, Petitioner's claim is without merit. Defense counsel's practical acknowledgment that, when arguing a motion, he considers who the trial judge is and adjusts his argument and style accordingly does not suggest deficient performance. On the contrary, it shows counsel's level of experience. Simply, put, the record does not show or even suggest that Petitioner's lawyer's "representation amounted to incompetence under 'prevailing professional norms.'" See Harrington, 562 U.S. at 105 (citing Strickland, 466 U.S. at 689).

Moreover, Petitioner's argument that had his attorney presented a more artfully crafted argument, his JOA motion would have been granted is speculative. He does not explain or point to facts showing "a reasonable probability that, but for counsel's [perceived] errors, the result of the proceeding would have been different." Id. In fact, the record shows the opposite: Petitioner's appellate attorney, in his Anders brief, raised the issue whether the trial court erred in submitting the armed kidnaping charge to the jury. Id. at 1046. As defense counsel argued in his motion for JOA, appellate counsel explained the potential point of error as follows:

> the victim made no mention of seeing the box cutter, or any other weapon during the course of the preliminary transportation to the secluded area, and only after stopping, and removing the victim to the back seat for the purpose of the sexual offenses did the [Petitioner] produce a weapon.

Id. at 1046. In affirming Petitioner's conviction, the Fifth DCA found no trial court error. Id. at 1065. As such, Petitioner cannot show any alleged deficiency by his trial attorney prejudiced him. Ground twenty-seven is denied.

### D. Grounds Twenty-Four through Twenty-Six & Twenty-Eight

In his remaining four grounds, Petitioner complains about perceived errors by the postconviction court in connection with his Rule 3.850 Motion proceedings. Sec. Am. Pet. at 47-79. Petitioner asserts the trial court erred in the following ways: failing to rule on his motion for appointment of postconviction counsel given the complexity of his postconviction claims (ground twenty-four), id. at 74; by acting as a "second prosecutor" during the evidentiary hearing (ground twenty-five), id.; by "abruptly discontinu[ing] the evidentiary hearing because Petitioner was "wasting time" (ground twenty-six), id. at 75; and by depriving Petitioner of a "full and fair evidentiary hearing" (ground twenty-eight), id. at 77, 79. According to Petitioner, the postconviction court's various alleged errors denied him due process.

Respondents argue Petitioner did not exhaust these grounds because he did not raise them in his appeal from the denial of his Rule 3.850 Motion. See Resp. at 15-16. The Court agrees.

Regardless, however, these claims are without merit because they are not cognizable in a federal habeas action as "unrelated to the cause of [P]etitioner's detention." Quince v. Crosby, 360 F.3d 1259, 1261 (11th Cir.

2004). In fact, the Eleventh Circuit "has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief." <u>Carroll v. Sec'y, DOC</u>, 574 F.3d 1354, 1365 (11th Cir. 2009). <u>See also</u> <u>Alston v. Dep't of Corr., Fla.</u>, 610 F.3d 1318, 1326 (11th Cir. 2010) (explaining that challenges to postconviction proceedings often "involve issues of state law," which are not proper grounds for seeing federal habeas relief); <u>Quince</u>, 360 F.3d at 1261 ("[A]n alleged defect in a collateral proceeding does not state a basis for habeas relief.").

"Errors or defects in state post[]conviction proceedings do not render a prisoner's detention unlawful or raise constitutional questions cognizable in federal habeas corpus proceedings." <u>Lewis v. Sec'y, Dep't of Corr.</u>, No. 8:08-cv-556-T-33TBM, 2009 WL 151097, at *6 (M.D. Fla. Jan. 21, 2009) (citing cases); <u>see also</u> <u>Keeler v. Jones</u>, No. 15-60333-Civ, 2016 WL 11688066, at *12 (S.D. Fla. Jan. 12, 2016), <u>report and recommendation adopted</u>, 2018 WL 10798972 (S.D. Fla. Mar. 15, 2018) ("Because a state has no constitutional duty to provide a means of post-conviction review of state convictions, alleged errors or defects in state post-conviction proceedings do not render a prisoner's detention unlawful or raise a constitutional question cognizable in federal habeas corpus proceedings."). Moreover, there is no constitutional right to counsel in state postconviction proceedings. <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987)

("[T]he right to appointed counsel extends to the first appeal of right, and no further."). See also Jones v. Crosby, 137 F.3d 1279, 1280 (11th Cir. 1998).

In grounds twenty-four through twenty-six and twenty-eight, Petitioner fails to allege or show that he is in custody in violation of the Constitution or laws of the United States. See 28 U.S.C. § 2254(a). As such, these grounds are denied.

Accordingly, it is now

**ORDERED:**

1. The Second Amended Petition (Doc. 14) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2. The **Clerk** shall enter judgment accordingly and close this case.

3. If Petitioner appeals the denial of his Petition, **the Court denies a certificate of appealability**.[24] The **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

---

[24] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

**DONE AND ORDERED** at Jacksonville, Florida, this 12th day of September 2022.

_____
BRIAN J. DAVIS
United States District Judge


Jax-6
c:    Michael Frye
        Counsel of Record